IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES W. TRENTHEM III and<br>NISA TRENTHEM as Husband<br>and Wife and SHANE FAULKNER | | PLAINTIFFS |
| v. | Case No. 1:09CV00017 JLH | |
| DAVID H. ARRINGTON<br>OIL & GAS, INC. | | DEFENDANT |

**OPINION AND ORDER**

James Trenthem III, Nisa Trenthem, and Shane Faulkner commenced this action against David H. Arrington Oil & Gas, Inc. ("Arrington"), alleging breach of contract, deceptive trade practices, and fraud. The dispute involves interpretation and enforcement of the terms of an alleged contract in which the plaintiffs executed an oil and gas lease to Arrington. The complaint asks that the Court find that a valid, enforceable contract existed between the plaintiffs and Arrington. Arrington has moved for summary judgment on all claims, and the plaintiffs have responded. For the following reasons, Arrington's motion for summary judgment is granted.

**I.**

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party

meets its burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1985) (quoting FED. R. CIV. P. 56(e)) (emphasis in original). A genuine issue exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.

## II.

The following material facts are undisputed. The plaintiffs are owners of an interest in a 40 acre tract of real property located in Cleburne County, Arkansas. The legal description for that property is as follows:

**SECTION 2 TOWNSHIP 11N RANGE 8W**

> 40.0 acres of land, more or less, being part of the Southeast Quarter of the Southwest Quarter (SE/4 of SW/4) and part of the Southwest Quarter of the Southeast Quarter (SW/4 of SE/4) located in Section 2, Township 11 North, Range 8 West, Cleburne County, Arkansas, and being more particularly described as 40.0 acres of land, more or less, in that certain Warranty Deed dated January 11, 2008 from Steve A. Melkovitz and Roberta Melkovitz, husband and wife, Grantors, to James W. Trenthem and Shane Faulkner, Grantees, as recorded at Document Number 200800264, of the Circuit Clerks Deed Records, Cleburne County, Arkansas.

When they purchased the property, the plaintiffs did not obtain title insurance or an abstract of title. The plaintiffs had a landman check the Cleburne County records for purposes of mineral ownership, but the landman could not guarantee title or insure that the plaintiffs were purchasing good title to the mineral rights.

Sometime in late August or early September 2008, James Trenthem went to Arrington's office to ask whether the company would be interested in an oil and gas lease of the property. Trenthem negotiated with Kent Jolly, Arrington's representative. After completing negotiations, the

2

plaintiffs offered[1] an oil and gas lease that was dated September 14 but actually executed on September 22, 2008. In addition to the lease agreement and bank drafts, the parties also executed a Memorandum Giving Notice of Oil and Gas Lease, dated September 22 and filed in Cleburne County Circuit Court on September 23. Arrington recorded the Memorandum to protect against third party filings.

Upon signing the oil and gas lease, the plaintiffs were to receive bank drafts as a method of paying the bonus consideration. On September 22, the plaintiffs received two bank drafts in the amount of $50,000 each: one to Shane Faulkner, and one to Mr. and Mrs. Trenthem. The bank drafts were executed at the same time as the oil and gas lease. The drafts provide, in pertinent part:

> On approval of lease or mineral deed described hereon, and *on approval of title to same by drawee* not later than 20 banking days after arrival of this draft at Collecting bank, with the right to Re-Draft,
>
> September 14, 2008
>
> PAY TO THE ORDER OF [Shane Faulkner] [James W. Trenthem and Nisa Trenthem]
>
> This draft is drawn to pay for Oil and Gas Lease, dated September 14, 2008 . . . .
>
> The drawer, payee and endorsers hereof, and the grantors of the lease or mineral deed described hereon, do hereby constitute and appoint the collecting bank escrow agent to hold this draft for the time above specified *subject alone to acceptance of payment hereof by drawee, within said time* . . . .
>
> In the event this draft is not paid within said time, the collecting bank shall return the same to forwarding bank *and no liability for payment or otherwise shall be attached to any of the parties hereto*.[2]

---

[1] In their response to Arrington's statement of undisputed material facts, the plaintiffs disagree with the characterization of the transaction as an offer.

[2] Although not italicized in the bank drafts, the words italicized here are the source of the present dispute.

James Trenthem and Shane Faulkner read, signed, and executed the aforementioned documents together on the same day. Arrington retained Robert White to begin checking the plaintiff's title to the mineral ownership. On October 14, 2008, White obtained a title report which indicated that the plaintiffs had executed an oil and gas lease of the subject property to Central Arkansas Shale, LLC, earlier that same year on May 1, 2008. Arrington was not advised of the Central Arkansas Shale lease during its negotiations with Trenthem. Arrington contacted Trenthem, who then requested that Central Arkansas Shale release its lease. The release was granted on October 16 and filed on October 20, 2008.

During the course of the title inspection, multiple issues were discovered. According to White's affidavit, the title problems included the following: gaps in the chain of title; heirships not established by recorded documents; an existing mortgage on the property in favor of Merchants & Planters Bank in Newport, Arkansas; and the previously existing lease to Central Arkansas Shale that was not released until October 20, 2008. After reviewing the issues presented in the title report, Arrington decided not to pay the bank drafts for Faulkner and the Trenthems. Arrington says it exercised its rights under the language of the bank draft after a good faith review of the title report. The plaintiffs concede that White discovered title issues, but they say that those issues did not affect whether they had marketable title.

On December 26, 2008, Western National Bank of Midland, Texas, the collecting bank, received the drafts. On or before the next day, White advised Arrington's bank draft supervisor, Kahlina Valadez, that Arrington did not approve of the plaintiffs' title based on the issues he had discovered. Valadez then told Western National Bank not to pay the drafts. Western National returned the drafts unpaid to the forwarding bank, which advised James Trenthem of the non-

payment. Trenthem went to Arrington's offices on or about October 28, 2008, and White told him of the title issues that he discovered in the title report. On November 20, 2008, Arrington's release of the plaintiff's oil and gas lease was filed in Cleburne County Circuit Court.

### III.

Both sides agree that, under Arkansas law, all the documents signed and executed in relation to the transaction at issue should be construed together as one in form and substance:

> The general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, are, in the eye(s) of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance.

*Sorrells v. Bailey Cattle Co.*, 268 Ark. 800, 810, 595 S.W.2d 950, 955 (1980) (quoting *Rawleigh Co. v. Wilkes*, 197 Ark. 6, 121 S.W.2d 886, 888 (1938)). An instrument is to be construed most strongly against the party that prepared it. *Falwell v. Am. Shale Resources, LLC*, 2007 WL 4219451, at *4 (E.D. Ark. Nov. 28, 2007) (citing *Harris v. Stephens Production Co.*, 310 Ark. 67, 72, 832 S.W.2d 837, 840 (1992)). In construing a contract, a court must give the language the meaning which the parties intended, and must consider the sense and meaning of the words as they are taken and understood in their plain, ordinary meaning. *Id.* (citing *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992)). In determining the parties' intention, a court must look to the contract as a whole and the circumstances surrounding its execution, rather than confining its analysis to particular words and phrases. *Id.*; *Coleman v. Regions Bank*, 364 Ark. 59, 65, 216 S.W.3d 569, 574 (2005) (citing *First Nat'l Bank of Crossett*, 310 Ark. at 170, 832 S.W.2d at 819). A court must read different clauses together and construe the contract so that all parts harmonize, if possible. *Am. Shale Resources*, 2007 WL 4219451, at *4. A court should avoid neutralizing a

5

provision if the contract can be construed to give effect to all provisions. *Id.* (citing *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 144, 147 S.W.3d 681, 685-86 (2004)).

In moving for summary judgment, Arrington argues that there is no disputing that a condition precedent to payment of the bank drafts—approval of title by Arrington—was not met, and thus no binding oil and gas lease was entered into between the parties. The bank drafts state that the collecting bank may pay the draft "[o]n approval of lease or mineral deed described hereon, and on approval of title to same by drawee [Arrington] not later than 20 banking days after arrival of this draft. . . ." The drafts then state that payment is "subject alone to acceptance of payment hereof by drawee, within said time," and if the draft is not paid within said time, "no liability for payment or otherwise shall be attached to any of the parties hereto." Arrington argues that the quoted language constitutes conditions precedent to the formation of a contract. Since none of those conditions occurred, no valid lease was formed.

Arrington cites to several cases in support of its argument. In *Whistle v. David H. Arrington Oil & Gas*, 2009 WL 1529819 (E.D. Ark. June 1, 2009), Judge Brian Miller of the Eastern District of Arkansas considered a case involving the same defendant and similar contract language. There, the parties executed an oil and gas lease, addendum, memorandum, and bank drafts all at the same time. The court construed those documents together as one in form and substance. The bank draft contained basically the same language as the drafts at issue in this case:

> On approval of lease or mineral deed described hereon, and on approval of title to same by drawee. . . .
>
> [T]here shall be no liability whatsoever on the collecting bank for refusal to return the same prior to such expiration.
>
> In the event this draft is not paid within said time, the collecting bank shall return the

6

same to forwarding bank and no liability for payment or otherwise shall be attached to any of the parties hereto.

The draft was returned unpaid, the plaintiff filed suit, and Arrington moved for summary judgment. The plaintiff relied on *First Nat'l Bank v. Rhode Island Ins. Co.*, 184 Ark. 812, 43 S.W.2d 535 (1931), *Cohn v. Jeffries*, 89 Ark. 144, 115 S.W. 926 (1909), and *St. Romain v. Midas Exploration, Inc.*, 430 So. 2d 1354 (La. Ct. App. 1983). Arrington cited to *Broughton Assocs. Join Venture v. Boudreaux*, 70 S.W.3d 324 (Tex. App. 2002) and *Spellman v. Lyons Petroleum, Inc.*, 709 S.W.2d 295 (Tex. App. 1986). After considering those cases, Judge Miller made the following findings:

> *[T]he words "[o]n approval of lease or mineral deed described hereon, and on approval of title to same" only placed a condition precedent of title approval on the formation of the contract. It appears to be undisputed that there was no issue as to the validity of the title, and thus, the condition was met.* The provision that the draft is "subject alone to acceptance of payment hereof by drawee, within said time" does not constitute a condition precedent because it simply restates the general principle that any draft must be accepted to charge the drawee. *Canal Ins. Co. v. First Nat'l Bank of Ft. Smith*, 266 Ark. 1044, 1050, 596 S.W.2d 710, 713 (1979). Furthermore, when read in conjunction with the Lease, the no liability clause does not relieve defendants of liability or cause a lack of mutuality. It is undisputed that the draft was not paid. Summary judgment in favor of plaintiff on the breach of contract claim is appropriate.

*Whistle*, 2009 WL 1529819, at *8 (emphasis added).

In this case, Arrington argues that the *Whistle* court correctly determined that the bank draft's language created a condition precedent—"approval of title"—to the formation of the contract. Because there was no issue as to title validity, that condition precedent was met and a contract was formed. Arrington takes issue, however, with the *Whistle* court's decision that the "upon acceptance" language in the draft was not a condition precedent to contract formation, but rather was simply a statement of the general principle that any bank draft must be accepted to charge the drawee. Arrington says that *Whistle* did not interpret the "upon acceptance" and "no liability"

7

clauses as part of or in context with the whole, and that those clauses are separate conditions precedent to contract formation.

In support of this argument, Arrington relies on *Spellman* and on *Falwell v. Am. Shale Resources, LLC*, 2007 WL 4219451 (E.D. Ark. Nov. 28, 2007). *Falwell* involved sight drafts that were payable upon "payor's acceptance, on or before *30* days after sight and subject to approval of title." Judge Susan Webber Wright of the Eastern District of Arkansas construed the lease, checks, and sight drafts as one instrument, and held that "American Shale's failure to approve title and pay the sight drafts on or before thirty days after sight or presentment was a failure of a condition precedent, the result being that there was no binding Lease between the parties." *Falwell*, 2007 WL 4219451, at *6 (citing to and collecting similar cases); *see also Encina Partnership v. Corenergy, L.L.C.*, 50 S.W.3d 66, 69 (Tex. App. 2001) (holding that "on approval of [permit or title]" language in draft created a condition precedent to the formation of a contract). *Spellman* also involved similar draft language. There, the Texas Court of Appeals relied on other Texas state court decisions in holding that the "no liability" clause caused the contract to fail for lack of mutuality. *Spellman*, 709 S.W.2d at 297-98.

If the clauses at issue create conditions precedent to contract formation, Arrington concludes that no contract was formed since it did not approve of the plaintiffs' title to the property. Arrington has submitted the title report as well as an affidavit from White, the one who inspected the plaintiffs' title. White and Arrington contend that the title issues included the following:

> (1) There is an 18 year gap in the chain of title from 1906 to 1924, and mineral title defects may be cured only by actually taking possession of the minerals, not by adverse possession of the surface land.

> (2) After conveyance to T. C. Carter and Jon Diffey, "Mrs Carter" subsequently

> conveyed her interest to C. L. DeClue in 1940. There is no probated will or evidence of heirship to T. C. Carter or Jon Diffey.
>
> (3) In 1948, persons claiming to be sole heirs of C. H. Sharp and Fannie Sharp conveyed their interest to Owen Babb. In the chain of title, there is no proof of the marriage or death of the Sharps, and no record of their probated estate.
>
> (4) In 1958, persons claiming to be heirs of C. L. DeClue conveyed an interest to Betty and Marily DeClue, but the record does not establish heirship.
>
> (5) The property was subject to a previously undisclosed mortgage in favor of Merchants & Planters Bank of Newport, Arkansas.

Arrington says that it disapproved of the plaintiff's title after a good faith inspection and relying on White's recommendation in good faith. Arrington argues that marketability of title is not the issue—the issue is whether it disapproved of the plaintiffs' title in good faith. In support, Arrington cites to the following cases: *Figg v. Cupit*, 401 So. 2d 722, 724 (Miss. 1981) ("[T]he question was not whether the grantors who executed the deed had a merchantable title, but whether the title was in such condition, in his lawyer's opinion, as to meet that individual's unqualified approval within the brief time limited. . . . He could rely upon the opinion of his lawyer and, in the absence of fraud or bad faith (of which there is no suggestion here) may reject a title not approved by him."); *Leroy v. Harwood*, 119 Ark. 418, 178 S.W. 427, 430 (1915) (if the party's attorney did not arbitrarily or capriciously disapprove the title, but instead "in good faith passed upon the title and declared the same unsatisfactory because, in his judgment, the title was not clear, then the appellee was not bound to pay the purchase money, although the title in fact might prove to be perfect"); *Dixie Oil Co. v. McBurnett*, 6 S.W.2d 83, 83-84 (Tex. Comm'n App. 1928) ("The rule is well settled that where parties enter into a contract providing that the purchase of property is subject to the approval or acceptance of the title by the purchaser's attorney, if the latter disapproves or refuses to accept it, the

9

seller is not entitled to enforce specific performance of the contract without pleading and proving that the attorney's rejection of the title was arbitrary or in bad faith.").

In their response brief, the plaintiffs admit that "the construction that is most consistent with all of the documents is that the parties had a binding agreement provided that plaintiffs had good title." The plaintiffs thus hang their hat on the argument that they had good and marketable title, meaning that they fulfilled the condition precedent created by the language "on approval of title to same by [Arrington]." In support of their argument, the plaintiffs quote from *Holt v. Manuel*, 186 Ark. 435, 54 S.W.2d 66 (1932):

> [I]n the final analysis a merchantable title is held to be one which imports such ownership as enables and insures to the owner the peaceable control and use of the property as against everyone else. It imports something more than a title which might ultimately prove impervious to assault. This court has approved the following definition of a merchantable title: "A marketable title is one that is free from reasonable doubt. There is reasonable doubt when there is uncertainty as to some defects appearing in the course of its deduction, and the doubt must be such as affects the value of the land, or will interfere with its sale. . . . The court will never compel a purchaser to take a title where the point on which it depends is too doubtful to be settled without litigation, or where the purchase would expose him to the hazard of such proceedings; or, as it is usually expressed, it will not compel him to buy a lawsuit.

*Holt*, 186 Ark. at 66-67 (internal citations and quotes omitted). That case is not on point. *Holt* involved the purchase of a lot, not a lease for mineral rights. *Holt* involved only one document, a purchase contract, rather than a series of documents that had to be construed together. There, the contract required the seller to show "good and merchantable title." Here, Arrington had to approve of plaintiffs' title. In *Holt*, two attorneys advised the purchaser that the title was defective, so the purchaser refused to complete the purchase. The sellers filed suit to remove the examining attorney's objections, and the attorney eventually changed his opinion and declared that the title was

10

good. After the purchaser still refused to finalize the transaction, the sellers instituted another action against him for specific performance of the contract. *Id.* at 66. It was in that context that the Arkansas Supreme Court discussed merchantability of title.[3]

The plaintiffs say that they are in the process of negotiating an oil and gas lease with another gas company.[4] The plaintiffs argue that another company's willingness to lease the property "is highly relevant to whether plaintiffs' title is marketable." The plaintiffs have also submitted an affidavit from Larry Graddy, an attorney with experience in real estate law and title work. Graddy testified that the plaintiffs possess marketable title to both the surface and mineral rights of the property. Although he says the title is marketable, Graddy's affidavit says nothing about whether Arrington disapproved of the title in bad faith or "arbitrarily or capriciously." *Leroy*, 178 S.W. at 430. Whether Graddy believes the plaintiffs' title is marketable, and whether another oil company might be willing to enter into a mineral lease with the plaintiffs, are irrelevant considerations. What is relevant is whether Arrington's disapproval of title was done in fraud or in bad faith. Arrington has presented the Court with legitimate reasons for concern about several issues with the plaintiffs' title, issues that even Graddy recognizes exist. The plaintiffs do not and cannot refute the issues discovered by Arrington. Instead they argue only that those issues do not affect marketability.

The plaintiffs' argument is well summarized in the closing paragraph of their response brief:

---

[3]The plaintiffs also cite the Court to *Chicago Title Ins. Co. v. Arkansas Riverview Development, LLC*, 573 F. Supp. 2d 1152 (E.D. Ark. 2008) (authored by the undersigned). Although that case discussed marketability of title, as that was a central issue, the plaintiffs do not explain how that case is relevant or helpful to their argument that the draft's requirement of "approval of title" by Arrington is the equivalent of marketability of title.

[4]The plaintiffs have filed a separate motion to supplement the record with evidence of this transaction.

"The documents, when considered in their totality, evidence an intent of the parties to be bound provided that the plaintiffs had marketable title. Plaintiffs have marketable title, therefore the defendant's motion for summary judgment should be denied." The plaintiffs thus impliedly admit that the language "on approval of title to same by [Arrington]" is a condition precedent to their oil and gas lease. The plaintiffs have provided the Court no authority holding that "approval of title" by the lessee is the legal equivalent of "marketability of title." Instead, the holdings in *Falwell* and *Whistle* from this district, as well as the other cases discussed above, support the conclusion that so long as Arrington's disapproval of title was not a fraud or in bad faith, then it had the legal right not to fulfill that condition precedent, regardless of whether the plaintiffs' title was legally marketable. As *Falwell* and *Whistle* have previously held, the language "on approval of title" in a bank draft executed at the same time as other contractual documents creates a condition precedent to the formation of the contract. The condition precedent is not marketability—it is approval of title. In the absence of fraud or bad faith, disapproval of title meant that the condition precedent remained unfulfilled. Because Arrington did not approve of the plaintiffs' title, and because there is no evidence that Arrington's disapproval was in bad faith, the condition precedent in the bank draft was not fulfilled. Therefore, no binding oil and gas lease was entered into between Arrington and the plaintiffs. Summary judgment in favor of Arrington is appropriate.

The complaint's counts for deceptive trade practices and fraud are short and contain no new factual allegations. After re-alleging the previous allegations as if fully set out therein, the count for deceptive trade practices alleges that the plaintiffs sustained damages "due to the unconscionable, false and deceptive acts or practices" of Arrington. The complaint does not set out the elements of a claim for deceptive trade practices or explain how Arrington's actions satisfied those elements.

12

The count for fraud merely quotes an Arkansas Supreme Court case's definition of constructive fraud. It does not set out the elements necessary to sustain a claim for fraud, nor does it explain how Arrington's actions satisfied those elements. The claims for fraud and deceptive trade practices are based entirely on the allegations relating to breach of contract claim, which the Court finds there is no genuine issue of material fact. To the extent that the complaint states a claim for deceptive trade practices and fraud, summary judgment is also granted in favor of Arrington on those claims.

## CONCLUSION

For the foregoing reasons, Arrington's motion for summary judgment is GRANTED. Document #8. The plaintiffs have also filed a motion to supplement the record with evidence of a transaction with another oil company for a mineral lease on the same property. Whether another oil company approves of the plaintiffs' title and whether the title is legally marketable are irrelevant to the Court's ruling on summary judgment. Therefore, the plaintiffs' motion to supplement the record is DENIED as moot. Document #19. The plaintiffs' claims against David H. Arrington Oil & Gas, Inc., are dismissed with prejudice.

IT IS SO ORDERED this 10th day of February, 2010.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE